**RECORD NOS.  14-1748(L) & 14-1749**

In The
# United States Court Of Appeals
## For The Fourth Circuit

**JOHN DOE #2,**

*Plaintiff-Appellant,*

v.

**PRESIDENT JOHN W. ROSA, individually,**

*Defendant-Appellee.*

---

**MOTHER DOE ON BEHALF OF JOHN DOE #3,**

*Plaintiff-Appellant,*

v.

**PRESIDENT JOHN W. ROSA, individually,**

*Defendant-Appellee.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AT CHARLESTON**

————————————

**BRIEF OF APPELLEE**

————————————

M. Dawes Cooke, Jr.
John W. Fletcher
BARNWELL WHALEY
  PATTERSON & HELMS, LLC
288 Meeting Street, Suite #200
Charleston, South Carolina 29401
(843) 577-7700

*Counsel for Appellee*

*Gibson*Moore Appellate Services, LLC
421 East Franklin Street ♦ Suite 230 ♦ Richmond, VA  23219
804-249-7770 ♦ www.gibsonmoore.net

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. _____        Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____

(name of party/amicus)

_____

 who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?      YES      NO

2.      Does party/amicus have any parent corporations?                                    YES      NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                       YES      NO
        If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?      YES      NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)      YES      NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?      YES      NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: _____      Date: _____

Counsel for: _____

## CERTIFICATE OF SERVICE

**************************

I certify that on _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____                _____
      (signature)                                      (date)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...........................................................................iv

COUNTERSTATEMENT OF THE
       ISSUES PRESENTED FOR REVIEW ..........................................1

COUNTERSTATEMENT OF THE CASE.......................................................2

    A.    Procedural History...................................................................2

    B.    General Factual Background ...................................................3

          1.    The Accusations Against ReVille ................................3

          2.    The Alleged Abuse of Plaintiffs .................................6

    C.    Plaintiffs Mischaracterize "Close Hold" ...............................7

    D.    Plaintiffs Misattribute Conduct to President Rosa ................9

    E.    Plaintiffs Rely on The Citadel's Internal Policies and/or Title
          IX, Which Are Irrelevant to Section 1983 Claims............................11

          1.    Internal Policies.........................................................11

          2.    Title IX ......................................................................12

    F.    President Rosa Did Not "Actively Conceal" ReVille's Alleged
          Abusive Conduct ..................................................................14

SUMMARY OF ARGUMENTS............................................................17

ARGUMENTS...................................................................................19

    A.    Standard of Review ........................................................19

    B.    Plaintiffs Fail to Show What *President Rosa* Did to Violate
          Their Rights.....................................................................20

C.    This Court Should Affirm the District Court's Grant of Summary Judgment Because Plaintiffs Do Not Proffer Evidence Creating a Genuine Issue of Material Fact of a "State Created Danger" .................................................................22

    1.    The Record and Governing Law Do Not Support Such a Claim ..............................................................................22

    2.    The Cases Plaintiffs Cite Are Inapposite ...................................30

D.    President Rosa Is Entitled to Qualified Immunity .............................33

    1.    General Qualified Immunity Standards .....................................33

    2.    The Constitutional Right Underlying Plaintiff's Claims Was Not Clearly Established in 2007 Under the Relevant Law ...............................................................................36

        a.    The Contours of the Claimed Constitutional Right ........36

        b.    The Constitutional Right Was Not Clearly Established At the Relevant Time ..................................38

E.    Plaintiff Proffer No Evidence Supporting a Section 1983 Conspiracy ...........................................................................39

    1.    Plaintiffs Cannot Possibly Satisfy the "Shocks the Conscience" Standard ......................................................39

    2.    There is No Evidence That President Rosa Participated in a Conspiracy Intended to Deprive Plaintiffs of Constitutional Rights .................................41

    3.    Plaintiffs' Claims Fail Under the Intra-Corporate Conspiracy Doctrine ......................................................46

G.    The Trial Court Properly Granted President Rosa's Motion for Summary Judgment Because Most of ReVille's Alleged Abuse Occurred *Prior to* President Rosa's Alleged Conduct ........................48

1.    Doe 2 ...................................................................................49

2.    Doe 3 ...................................................................................52

3.    Because Nearly All of the Alleged Abuse Occurred Before President Rosa Could Have Reasonably Acted, Plaintiffs' State-Created Danger Claim Must Fail ...................52

CONCLUSION ......................................................................................57

REQUEST FOR ORAL ARGUMENT ...................................................57

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Abercrombie v. City of Catoosa Okl.*,
    896 F.2d 1228 (10th Cir. 1990) ................................................................42

*Anderson v. Creighton*,
    483 U.S. 635 ................................................................33, 34, 36

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ................................................................20

*Armijo v. Wagon Mound Public Schools*,
    159 F.3d 1253 (10th Cir. 1998) ................................................31, 53, 56

*Ashcroft v. al-Kidd*,
    131 S. Ct. 2074 (2011) ................................................................35

*Ashcroft v. Iqbal*,
    556 U.S. 662, 129 S. Ct. 1937 (2009) ................................................21

*Baker v. McClellan*,
    443 U.S. 137, 99 S. Ct. 2689, 61 L. Ed. 2d 433 (1976) ................................12

*Bowers v. DeVito*,
    686 F.2d 616 (7th Cir. 1982) ................................................................25

*Brosseau v. Haugen*,
    543 U.S. 194, 125 S. Ct. 596, 160 L.Ed.2d 583 (2004) ................................36

*Burton v. Benson*,
    2009 WL 1351159 (E.D. Wash. May 11, 2009) ................................................53

*Buschi v. Kirven*,
    775 F.2d 1240 (4th Cir. 1985) ................................................................47

*Camreta v. Greene*,
    131 S. Ct. 2020 (2011) ................................................................33

iv

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)...............................................................................19

*County of Sacramento v. Lewis*,
    523 U.S. 833 (1998)...........................................................................39, 40

*D.N. ex rel. Nelson v. Snyder*,
    608 F. Supp. 2d 615 (M.D. Pa. 2009)...............................................32

*Davis v. Scherer*,
    468 U.S. 183 (1984)...............................................................................33

*DeShaney v. Winnebago County Dep't of Soc. Servs.*,
    489 U.S. 189 (1989)......................................................................*passim*

*Doe ex rel. Johnson v. SCDSS*,
    597 F.3d 163 (4th Cir.), *cert denied*,
    131 S. Ct. 392 (2010)........................................................................26, 27

*Doe v. Marion*,
    373 S.C. 390, 645 S.E.2d 245 (2007) ..............................................29

*Doe v. Taylor Indep. Sch. Dist.*,
    15 F.3d 443 (5th Cir. 1994) .............................................................30

*Dowe v. Total Action Against Poverty in Roanoke Valley*,
    145 F.3d 653 (4th Cir. 1998) ...........................................................20

*Edwards v. City of Goldsboro*,
    178 F.3d 231 (4th Cir. 1999) ...........................................................35

*Fonda v. Gray*,
    707 F.2d 435 (9th Cir. 1983) ...........................................................42

*Fox v. Custis*,
    712 F.2d 84 (4th Cir. 1983) ......................................................... 24-25

*Gebser v. Lago Vista Indep. Sch. Dist.*,
    524 U.S. 274 (1998)........................................................................13, 14

*Gilmer v. Martin*,
   323 S.C. 154, 473 S.E.2d 812 (Ct. App. 1996) ...............................................29

*Hafner v. Brown*,
   983 F.2d 570 (4th Cir. 1992) .....................................................................42

*Hall v. Tawney*,
   621 F.2d 607 (4th Cir. 1980) .....................................................................24

*Harlow v. Fitzgerald*,
   457 U.S. 800 (1982)....................................................................................33

*Henson v. Liggett Group, Inc.*,
   61 F.3d 270 (4th Cir. 1995) .......................................................................19

*Hinkle v. City of Clarksburg*,
   81 F.3d 416 (4th Cir. 1996) .......................................................................42

*Hunter v. Turner*,
   2007 WL 2284481 (D.S.C. Aug, 6, 2007)..................................................12

*Jackson v. City of Joliet*,
   715 F.2d 1200 (7th Cir. 1983) ...................................................................53

*Jackson v. Long*,
   102 F.3d 722 (4th Cir. 1996) .....................................................................35

*Jean v. Collins*,
   155 F.3d 701 (4th Cir.1998) ......................................................................35

*Jones v. City of Chicago*,
   856 F.2d 985 (7th Cir. 1988) .....................................................................32

*Kerns v. Independent Sch. Dist. No. 31*,
   984 F. Supp. 2d 1144 (N.D. Okla. 2013) ..................................................56

*Kneipp v. Tedder*,
   95 F.3d 1199 (3rd Cir. 1996) .....................................................................31

*Malley v. Briggs*,
   475 U.S. 335, 106 S. Ct. 1092, 89 L.Ed.2d 271 (1986) ........................32, 35

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)................................................................................20

*McKinney v. Richland Cnty. Sheriff's Dep't*,
    431 F.3d 415 (4th Cir. 2005)................................................................34

*McWilliams v. Fairfax Cty. Bd. of Supervisors*,
    72 F.3d 1191 (4th Cir. 1996)................................................................20

*Meeker v. Edmundson*,
    415 F.3d 317 (4th Cir. 2005)................................................................34

*Moore v. Utah*,
    2013 WL 3148474 (D. Utah June 19, 2013)................................................55

*Parrish v. Cleveland*,
    372 F.3d 294 (4th Cir. 2004)................................................................34

*Pascocciello v. Interboro Sch. Dist.*,
    2006 WL 1284964 (E.D. Pa. May 8, 2006)................................................32

*Patten v. Nichols*,
    274 F.3d 829 (4th Cir. 2001)............................................................*passim*

*Pinder v. Johnson*,
    54 F.3d 1169 (4th Cir. 1995)............................................................*passim*

*Reed v. Gardner*,
    986 F.2d 1122 (7th Cir. 1993)....................................................25, 54, 55

*Reichle v. Howards*,
    132 S. Ct. 2088 (2012)........................................................................36, 37

*Robinson v. Lioi*,
    536 Fed. Appx. 340 (4th Cir. July 30, 2013)....................................27, 28, 29

*Rogers v. City of Port Huron*,
    833 F. Supp. 1212 (E.D. Mich. 1993)................................................54

*Sales v. Grant*,
    158 F.3d 768 (4th Cir. 1998)................................................................31

*Sargi v. Kent City Bd. of Educ.*,
   70 F.3d 907 (6th Cir. 1995) .......................................................................53

*Scherer v. Balkema*,
   840 F.2d 437 (7th Cir. 1988) ....................................................................42

*Slakan v. Porter*,
   737 F.2d 368 (4th Cir. 1984) ....................................................................32

*Slaughter v. Mayor and Council of City of Baltimore*,
   682 F.3d 317 (4th Cir.), *cert. denied*,
   133 S. Ct. 616 (2012)...........................................................................40, 41

*Smith v. Bacon*,
   699 F.2d 434 (8th Cir. 1983) ....................................................................43

*Stoneking v. Bradford Area Sch. Dist.*,
   882 F.2d 720 (3d Cir. 1989) .....................................................................30

*Troxel v. Granville*,
   530 U.S. 57 (2000)....................................................................................23

*Veney v. Ojeda*,
   321 F. Supp. 2d 733 (E.D. Va. 2004) .......................................................47

*Walters v. City of Charleston*,
   2002 WL 34703346 (D.S.C. Feb. 7, 2002) ...............................................47

*Ward v. Coastal Carolina Health Care, P.A.*,
   597 F. Supp. 2d 567 (E.D.N.C. 2009) .......................................................47

*Waybright v. Frederick County*,
   528 F.3d 199 (4th Cir. 2008) ....................................................................40

*White v. Rochford*,
   592 F.2d 381 (7th Cir. 1979) ....................................................................30

*Whitman v. Nesic*,
   368 F.3d 931 (7th Cir. 2004) ....................................................................12

*Wiley v. Doory*,
   14 F.3d 993 (4th Cir. 1994) ........................................................................34

*Wood v. Ostrander*,
   879 F.2d 583 (9th Cir. 1989) ....................................................................30

*Yeremian v. Southeastern Pa. Transp. Auth.*,
   2012 WL 440635 (E.D. Pa. Feb. 7, 2012) ..................................................53

*Young v. City of Mount Ranier*,
   238 F.3d 567 (4th Cir. 2001) ....................................................................39

**Statutes:**

20 U.S.C. §§ 1681, *et seq.* (Title IX) ..............................................*passim*

20 U.S.C. § 1682 ..............................................................................14

42 U.S.C. § 1983 ..............................................................................*passim*

S.C. Code Ann. § 20–7–1576 ..............................................................27

**Rule:**

Fed. R. Civ. P. 56(c) ..........................................................................19

## COUNTERSTATEMENT OF THE ISSUES
## PRESENTED FOR REVIEW

1.    Did the district court properly grant summary judgment where Plaintiffs proffer no evidence that President Rosa participated in the alleged violations of their constitutional rights?

    Suggested Answer:  YES.

2.    Did the district court properly grant summary judgment where Plaintiffs proffer no evidence that President Rosa actively created a danger, but rather seek to hold him responsible for failing to protect them from ReVille?

    Suggested Answer:  YES.

3.    Did the district court properly grant summary judgment where the alleged constitutional violation — failing to protect unnamed persons from abuse by a private person — was not clearly established at the time of the alleged conduct?

    Suggested Answer:  YES.

4.    Did the district court properly grant summary judgment where Plaintiffs failed to proffer evidence of an actionable conspiracy?

    Suggested Answer:  YES.

5.    Did the district court properly grant summary judgment where nearly all of the abuse occurred well before President Rosa could have known about the allegations against ReVille?

    Suggested Answer:  YES.

## COUNTERSTATEMENT OF THE CASE

**A.**    **Procedural History**

This appeal is the consolidation of two appeals raising identical legal issues:

- *John Doe 2 v. President John W. Rosa,* No. 14-1748(L); and
- *Mother Doe 3, on Behalf of John Doe 3 v. Rosa,* No. 14-1749.

On or about March 19, 2012, Plaintiffs commenced these lawsuits in the District of South Carolina against President John W. Rosa ("President Rosa"). (*See generally* J.A. 1-29). They also filed cases against non-party The Citadel, the Military College of South Carolina ("The Citadel") in state court under the South Carolina Tort Claims Act. On April 26, 2012, Plaintiffs filed Amended Complaints, asserting claims sounding in: (a) conspiracy pursuant to 42 U.S.C. § 1983; (b) supervisory liability under Section 1983; and (c) state law civil conspiracy. (J.A. 30-47, 56-73).

President Rosa moved to dismiss Plaintiffs' Amended Complaints, arguing, *inter alia*, that he was entitled to qualified immunity because Plaintiffs failed to allege that he violated clearly-established constitutional rights. (*See generally* J.A. 74-129). By Order filed September 18, 2012, the district court granted in part and denied in part motions to dismiss. (*See generally* J.A. 212-245). The court dismissed Plaintiffs' claims for supervisory liability pursuant to 42 U.S.C. § 1983 and state law civil conspiracy. *Id.* The court denied the motion to dismiss Plaintiffs' claim for conspiracy liability pursuant to 42 U.S.C. § 1983. *Id.*

2

Of relevance to this appeal, on March 13, 2014, President Rosa filed his Second Motions for Summary Judgment arguing, *inter alia*, that Plaintiffs could not create a genuine issue of material fact supporting their claims. (*See generally* J.A. 246-337). On March 31, 2014, Plaintiffs filed their Oppositions to President Rosa's Motions for Summary Judgment. (*See generally* J.A. 338-4370). On April 10, 2014, President Rosa filed his Reply in Support of Second Motions for Summary Judgment. (*See generally* J.A. 4371-4484). On May 28, 2014, the District Court requested further briefing relating to the dates of Plaintiffs' alleged abuse. Consequently, on June 9 and 19, 2014, respectively, President Rosa and Plaintiffs filed supplemental memoranda relating to the Second Motions for Summary Judgment. (*See generally* J.A. 4704-5238). On June 27, 2014, the District Court granted President Rosa's Second Motions for Summary Judgment and dismissed Plaintiffs' claims with prejudice. (*See generally* J.A. 5239-5252).

On July 24, 2014, Plaintiffs filed the instant Notices of Appeal seeking review of the granting of President Rosa's Second Motions for Summary Judgment.

**B.**  **General Factual Background**

**1.**  **The Accusations Against ReVille**

The Citadel Summer Camp operated each summer from approximately 1957 until it closed in 2006, for the "purpose of bringing aspects of The Citadel's college experience to young children and to recruit future Citadel cadets." Each summer,

current and former Citadel cadets were selected to serve as staff and senior camp counselors. For several years The Citadel employed ReVille, a former cadet, as a camp counselor.

On April 23, 2007, a former camper's ("Camper Doe") father reported to The Citadel that ReVille engaged in sexual misconduct with his son at the summer camp in 2002. Camper Doe's father called President Rosa's office and asked to speak directly with him. Because President Rosa was out of the office, Camper Doe's father spoke with Wanda Milligan, President Rosa's Administrative Assistant. Ms. Milligan immediately contacted The Citadel's in-house General Counsel, Mark Brandenburg ("Attorney Brandenburg"), who called Camper Doe's father to discuss the allegations. (Doe 2 Docket Entry # 53-2 ¶¶ 2-3; Doe 3 Docket Entry # 33-2 ¶¶ 2-3). During the telephone conversation, the father told Attorney Brandenburg that during Camper Doe's stay at summer camp, a counselor named "Skip" invited his son, a minor at that time, into his room and they "watched pornography and masturbated." (*See id.* ¶ 3). Attorney Brandenburg subsequently spoke with Camper Doe, by then an adult, via telephone. Camper Doe reported that "on one occasion, 'Skip' had invited him into his room and showed him pornography" and "convinced him to masturbate while in the room." (*See id.* ¶ 4). Attorney Brandenburg reviewed documentation and discovered a Cadet in Charge of Quarters and Senior Counselor for the 2001 and 2002 camps named Louis "Skip" ReVille. (*See id.* ¶ 5).

4

President Rosa learned about Camper Doe's accusations from Attorney Brandenburg sometime between April 23 and May 9, 2007.  (Doe 2 Docket Entry # 53-3 ¶ 2; Doe 3 Docket Entry # 33-3 ¶ 2).  Attorney Brandenburg conducted an investigation into Camper Doe's allegations, including interviewing officers in charge of the summer camp, contacting other counselors and campers, interviewing ReVille, and interviewing the former camper and his parents; ReVille denied the allegations.  Attorney Brandenburg interviewed Camper Doe and his parents in person.  He periodically updated President Rosa on the status of his investigation through August 2007.  (*See generally* Doe 2 Docket Entry # 53-2; Doe 3 Docket Entry # 33-2).  The former camper and his parents did not report his complaint to law enforcement, nor did anyone at The Citadel.  Regardless of the correctness of this action[1], there is no evidence that President Rosa even knew that the family had not reported ReVille's misconduct to law enforcement, let alone that he directed that The Citadel not report it.

President Rosa did not personally conduct or direct the investigation.  He did not communicate in any way with ReVille.  He did not have any knowledge about the termination of ReVille's employment as a tutor in The Citadel's Writing Center.

---

[1] The Citadel's Sexual Assault Crisis Intervention Policy in effect in 2007 permitted victims to make decisions concerning the reporting of a sexual assault. "First and foremost, it is important to respect the wishes of the individual who has been sexually assaulted, especially as to whether to file a formal complaint or criminal charges.  The healing process begins with this individual's control of decision-making that may affect his/her life dramatically."  (J.A. 1418¶ 6.A).

He did not enter into any agreement, or direct that any agreement be made, concerning the termination of ReVille's employment. In fact, ReVille had already submitted his resignation, for personal reasons unrelated to any claims of misconduct, before the former camper's father contacted The Citadel. President Rosa never spoke to the former camper or his parents, let alone assure them that their complaint would be reported to law enforcement officials or offer them money in exchange for their silence. He did not participate in any settlement negotiations with the former camper or his parents.

In October 2011, ReVille's numerous acts of sexual misconduct against dozens of victims came to light. At the completion of law enforcement investigations, ReVille was charged in Charleston, Berkeley, and Dorchester counties. On June 13, 2012, ReVille pleaded guilty to numerous charges of criminal sexual conduct with a minor, solicitation of a minor, lewd acts upon a minor, and dissemination of obscene material, and sentenced to fifty years imprisonment.

### 2.     <u>The Alleged Abuse of Plaintiffs</u>

Plaintiffs allege ReVille sexually abused them[2] years after the alleged 2002 incident involving Camper Doe. Plaintiffs do not claim that ReVille molested

---

[2]   In the action styled *Mother Doe 3, on Behalf of John Doe 3 v. Rosa*, the named Plaintiff is actually the mother of the allegedly abused minor. Nonetheless, for simplicity and ease of reference herein, where appropriate President Rosa will use the term "Plaintiffs" to refer to the alleged victims of abuse by ReVille in both lawsuits.

them at The Citadel in the scope of employment at The Citadel.  The present no evidence that President Rosa took any actual steps to cover up Camper Doe's report.  They present no evidence that President Rosa took any steps to stop Camper Doe from reporting his alleged abuse to the police.  They present no evidence that President Rosa knew them.  They present no evidence that President Rosa knew or intended that ReVille would molest them.  Nevertheless, they claim that President Rosa's deliberate concealment of Camper Doe's allegations against ReVille to protect The Citadel's reputation caused their molestation.

## C.    Plaintiffs Mischaracterize "Close Hold"

Plaintiffs attempt to implicate President Rosa in a cover-up by invoking the ominous-sounding military term "close hold" to suggest a concerted cover up.  However, the *only* evidence that Plaintiffs use to back up this contention is the deposition testimony of Jennifer Shiel, the former assistant to Attorney Brandenburg.  Ms. Shiel was more than willing to speculate that President Rosa wanted to suppress Camper Doe's complaint about ReVille.  Yet her speculation was not based upon any personal knowledge but was based entirely on her recollection that the complaint was to be kept on "close hold". She testified simply that "close hold" was a military term signifying the common sense idea that sensitive information should not be disseminated beyond people who need to know it:

Q:     Having worked in the President's office during this time
       period, was there ever any doubt in your mind that President
       Rosa wanted this report of sexual abuse to be kept under
       wraps?

MR. KOVACH: Objection.

A:     No.  It was very clear that -- the term that was used about it
       was "close hold."  I mean, only people that needed to know
       about it were supposed to know about it.  That was it.  . . .

Q:     Right.  And, like, what other matters do you remember "close
       hold" being the orders from the President being --

A:     It would have been in relationship to, for example, say
       some sort of touchy personnel matter, you know, something
       like that, where, you know, there were only the people that
       needed to know about it -- you know, it would have been
       something very -- you know, that -- very critical but very
       sensitive.  And so, you know, it was only the people that
       needed to know.

Ms. Shiel has not testified that she had direct knowledge that President Rosa

instructed or caused any actual cover up of ReVille; instead, her testimony

discloses, at most, a sensitivity to Camper Doe's accusations.

Equating "close hold" of a sensitive investigation with an illegal cover-up of

sexual abuse is a cornerstone of Plaintiffs' claims against President Rosa.  They

ask the Court to infer that, because President Rosa did not immediately conclude

from the Camper Doe's complaint that ReVille was a serial child molestor,

President Rosa intended to enable ReVille to molest the Plaintiffs.  The "close

hold" argument illustrates the fallacy in imputing conspiratorial intent to President

8

Rosa.  If anything, it would have been reckless *not* to treat Camper Doe's report as confidential.    In fact, Camper Doe and his parents expressly requested confidentiality, a request they have maintained in Camper Doe's own lawsuit (as Plaintiffs have done in these cases).  Far from being part of a sinister conspiracy, "close hold" reflects the appropriate policy that sensitive information should be maintained with discretion.  Despite her evident disdain for President Rosa, she does not testify that he ordered a cover-up of Camper Doe's complaint.  There is no direct evidence President Rosa gave the accusations of Camper Doe "close hold" treatment as part of a cover up.

Ms. Shiel's testimony represents the high water mark of Plaintiffs' claim against President Rosa.  Despite the production of many thousands of pages of documents and the taking of dozens of depositions, Plaintiffs do not proffer a single piece of competent evidence that President Rosa ever intended to enable ReVille to harm any child, let alone the Plaintiffs.

**D.    Plaintiffs Misattribute Conduct to President Rosa**

Perhaps Plaintiffs' most glaring error is that they conflate President Rosa with The Citadel and its other agents.  Despite having had ample opportunity to depose President Rosa and other witnesses, and to conduct voluminous documentary discovery, Plaintiffs present no evidence that *President Rosa* personally had relevant knowledge or that *he* acted to violate Plaintiffs'

9

constitutional rights.   In fact, Plaintiffs do little to show what, if anything, President Rosa did at all.  As discussed below, this is woefully inadequate under Section 1983, which requires Plaintiffs to show that President Rosa himself acted to violate their constitutional rights.

Instead, Plaintiffs use supposition and innuendo in an effort to impute the knowledge and conduct of others to President Rosa, without any factual or legal foundation for doing so.  Some of the more telling examples follow:

- Plaintiffs state that President Rosa "had access to ReVille's Citadel file containing his former counselor performance evaluation . . . as well as his counselor application."  (Doc. # 17, at 9).   However, Plaintiffs cite no evidence that President Rosa actually had access to that information or had any knowledge of that information.

- Plaintiffs state that by May 6, 2007, Attorney Brandenburg had told President Rosa "all of the information he compiled for him on the ReVille complaint so far, which included that Camper Doe disclosed that another camper had been abused by ReVille with him" and that the other camper was a current cadet.  (Doc. # 17, at 9).  However, Plaintiffs do not present specific evidence that President Rosa was actually told this information.

- Plaintiffs state that on May 8, 2007, Attorney Brandenburg "memorialized by email his and President Rosa's intentions to keep the ReVille complaint 'close hold.'"  (Doc. # 17, at 9).  Although Plaintiffs suggest that this was a "smoking gun" confirming a cover up, the actual email was far more innocuous.  Attorney Brandenburg wrote this email to a potential witness; Plaintiffs present no evidence that President Rosa ever received or saw the email.  Moreover, it does not evince a cover up; instead, it plainly reflects a hope that an internal investigation would lead to a conclusion that Camper Doe's report was unfounded, thereby avoiding a more formal investigation or proceeding.  (J.A. 1005).

10

- Plaintiffs claim that President Rosa had some involvement in the termination of ReVille's employment.  However, there is not a scintilla of evidence that President Rosa was in any way involved in this or even knew about it.

Plaintiffs' brief is replete with other examples where they accuse President Rosa of engaging in misconduct regarding ReVille.  However, in the end, Plaintiffs proffer no evidence that President Rosa knew or did anything to create a danger to Plaintiffs.  Instead, Plaintiffs generally group President Rosa (and the "office of the president") with other agents of The Citadel.

**E.    Plaintiffs Rely on The Citadel's Internal Policies and/or Title IX, Which Are Irrelevant to Section 1983 Claims**

Plaintiffs devote a substantial portion of their Brief to arguing that President Rosa violated The Citadel's internal policies and procedures in failing to report ReVille.  (Doc. # 17, at 10-13).  Plaintiffs also posit that President Rosa violated Title IX, 20 U.S.C. §§ 1681, *et seq*.  (Doc. # 17, at 13-15).  These claimed "facts" are wholly irrelevant to the claims against President Rosa, seeking to enforce the Due Process Clause through Section 1983.

**1.    Internal Policies**

The law is clear that Section 1983 may not be utilized to remedy violations of such state laws or policies:

> To the extent that Plaintiff's claim arises out of his argument that, in allowing Bates to serve as the accuser at his hearing, the hearing officer violated the *Department's own internal policies or procedures with respect to his hearing, that argument does not set forth a constitutional claim cognizable in this Court under § 1983.* . . . If Plaintiff believes he has a claim due to a violation of some prison policy or administrative procedure, he should pursue that claim in an appropriate state forum. *See DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 200-203, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989) [§ 1983 does not impose liability for violations of duties of care arising under state law]; *Baker v. McClellan*, 443 U.S. 137, 146, 99 S. Ct. 2689, 61 L. Ed. 2d 433 (1976) [§ 1983 claim does not lie for violation of state law duty of care].

*See Hunter v. Turner*, 2007 WL 2284481, at *6 n.5 (D.S.C. Aug, 6, 2007) (emphasis added) (J.A. 4433-4441); *accord Whitman v. Nesic*, 368 F.3d 931, 935 n.1 (7th Cir. 2004) ("[V]iolations of internal policies and procedures do not give rise to a constitutional violation."). Moreover, Plaintiffs can make no showing that President Rosa himself acted in violation of any policy of The Citadel.

### 2. <u>Title IX</u>

Plaintiffs have not asserted Title IX claims and have never argued that they pled such claims. Therefore, Plaintiffs cannot potentially contend that alleged violations of Title IX have any bearing on their Section 1983 claims.

Plaintiffs posit that Title IX obligated The Citadel to engage in investigatory and remedial actions in response to Camper Doe's report, but cite no authority imposing obligations on President Rosa individually. Plaintiffs rely on

the United States Office for Civil Rights, Department of Education's 2000 "Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties" ("OCR Guidance"), particularly its "administrative" provisions governing responses to sexual harassment complaints. However, the OCR Guidance makes clear that it is *not* intended to set standards for legal claims:

> The 1997 guidance contained a section titled "Liability of a School for Sexual Harassment." To the extent this section could be interpreted as being applicable to a school's liability in a private lawsuit for monetary damages, the proposed revised guidance clarifies that the guidance addresses the Department's administrative enforcement of Title IX; *it does not address standards applicable to private litigation for monetary damages.*

(J.A. 1394 (emphasis added)). The OCR Guidance clarifies that the United States Supreme Court has foreclosed the use of such "administrative" standards to define civil liability:

> The discussion of liability in the 1997 guidance contained a section on the effect of grievance procedures. To the extent this section could be interpreted to guide courts regarding liability for monetary damages, this section was affected by *Gebser* and *Davis*.

(J.A. 1395). *Gebser* confirms that the administrative standards of the OCR Guidance should not form the basis for a civil claim:

13

> [T]he failure to promulgate a grievance procedure does not itself constitute "discrimination" under Title IX. Of course, the Department of Education could enforce the requirement administratively: Agencies generally have authority to promulgate and enforce requirements that effectuate the statute's nondiscrimination mandate, 20 U.S.C. § 1682, even if those requirements do not purport to represent a definition of discrimination under the statute. [Citation omitted.] We have never held, however, that the implied private right of action under Title IX allows recovery in damages for violation of those sorts of administrative requirements.

*See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 292 (1998).

For these reasons, Plaintiffs' reliance on Title IX is misplaced.

## F. President Rosa Did Not "Actively Conceal" ReVille's Alleged Abusive Conduct

Another linchpin of Plaintiffs' theory of the case is that President Rosa took steps to conceal ReVille's abuse. Plaintiffs claim that President Rosa sent Mark Brandenburg to Dallas to speak with Camper Doe. (Doc. 17, at 15 (*citing* J.A. 1972-73)). However, Attorney Brandenburg does *not* testify that President Rosa "sent" him. To the contrary, his testimony is unclear as to who made the decision for him to go; if anything, the cited testimony suggests that the decision was made in discussions between Attorney Brandenburg and The Citadel's insurer. (*Id.*). Thus, Plaintiffs present no evidence that President Rosa made that decision as part of a plot to conceal ReVille's abuse. It is in any event telling that Plaintiffs would characterize the initiation of an investigation into the Camper Doe complaint as a cover-up.

Plaintiffs further posit that President Rosa "took additional action to conceal the complaint" by "ensur[ing] that the General Counsel files did not indicate in any way a child sexual abuse claim against ReVille." (Doc. # 17, at 17). However, in support of this accusation, Plaintiffs cite only two unauthenticated documents: 2007 and 2010 lists of general counsel files. (J.A. 2421-38). However, there is no evidence in the record that President Rosa was even aware of these documents, let alone that he "ensured" they did not reference claims against ReVille. Moreover, although Plaintiffs' argue that the file lists were intended avoid making information about ReVille "available to the South Carolina Budget and Control Board" (Docket Entry # 17, at 17), this contention defies logic. In reality, Attorney Brandenburg specifically reported the Camper Doe complaint to the South Carolina Insurance Reserve Fund (which actually paid for Attorney Brandenburg to interview Camper Doe), an agency of the Budget and Control Board. (*See e.g.*, J.A. 3764-65).

Plaintiffs additionally claim that President Rosa "acted to conceal ReVille as a known pedophile when The Citadel withdrew its challenge to the South Carolina Employment Security Commission finding ReVille eligible for unemployment." (Doc. # 17, at 18-19). ReVille never actually received an unemployment check after that appeal was withdrawn. Plaintiffs present no evidence that President Rosa even knew of the appeal, let alone that he directed it be withdrawn. Plaintiffs present no evidence that whoever made that decision had *any* knowledge of Camper Doe's accusations. While Plaintiffs proffer the testimony of ReVille as to

15

his belief that they appeal was withdrawn because "they did not want to have anything to do with me as far as any kind of confrontation," ReVille had no factual basis for his belief, especially as to any involvement by President Rosa. ReVille did not testify that he spoke to anyone at The Citadel about this subject. There is no documentary or testimonial evidence supporting his belief that the appeal was withdrawn for this reason. Moreover, the Budget and Control Board's Employee Insurance Program filed the actual appeal document on behalf of The Citadel. (J.A. 4878).

There is no admissible evidence that President Rosa did *anything* to conceal ReVille's abuse.

## SUMMARY OF ARGUMENTS

The district court properly concluded that President Rosa is entitled to judgment as a matter of law under Section 1983. As a result, this Court should affirm the entry of summary judgment in favor of President Rosa.

First, Plaintiffs can proffer no evidence that President Rosa himself participated in any of the acts allegedly violating their constitutional rights. Instead, Plaintiffs rely on innuendo and speculation to suggest that President Rosa should be held liable for the claimed acts of others. They do not, despite conducting voluminous discovery, show what he himself did to cause their injuries.

Next, Plaintiffs cannot show that this case is a "state-created danger" situation, because there is no evidence that President Rosa acted to *create* any risk of harm. To the contrary, Plaintiffs' claims boil down to allegations that President Rosa should have prevented ReVille from abusing them. The law of the Supreme Court and this Circuit makes clear that this is not enough for a state-created danger claim.

In addition, even if a right *could* exist, it was not clearly established at the time of the alleged conduct. Review of the relevant case law would not have placed President Rosa on notice that he owed any duty to protect the Plaintiffs from ReVille. Instead, Plaintiffs' claim runs contrary to the law as it existed at the

time and relies on case law from other jurisdictions that is not even relevant to this analysis.

Alternatively, Plaintiffs do not proffer evidence supporting a conspiracy claim. They do not show that ReVille had conspiratorial intent or engaged in steps in furtherance of the conspiracy. Further, the alleged "conspiracy" was between President Rosa and other Citadel agents. This is not actionable under the "intracorporate conspiracy" doctrine.

Finally, Plaintiffs' claims fail because the danger of abuse that ReVille presented actually existed and had come to fruition well before President Rosa's alleged misconduct. Simply put, President Rosa could not "create" a danger that already existed. This is the ground that the district court relied upon to grant summary judgment.

## ARGUMENTS

**A.    Standard of Review**

This Court's standard of review is *de novo.  See Henson v. Liggett Group, Inc.*, 61 F.3d 270, 274 (4th Cir. 1995).  Summary judgment is proper where "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *See* Fed. R. Civ. P. 56(c).  "Rule 56(c) mandates the entry of summary judgment … against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Where the nonmovant bears the burden of proof, the movant "bears the initial responsibility of informing the district court of the basis for its motion" and pointing out "that there is an absence of evidence to support the nonmoving party's case." *See id.* at 323-25.  The nonmovant must proffer evidence sufficient to establish each element of the claim. *Id.* at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.  The moving party is 'entitled to summary judgment as a matter of law' because the nonmoving party has failed to make a showing on an essential element of her case with respect to which she has the burden of proof." *Id.* at 323.

"When the moving party has carried its burden . . . its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (citations omitted). "[T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial . . . [and w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *See id.* at 587 (citations omitted). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986) (citations omitted).

## B.    Plaintiffs Fail to Show What *President Rosa* Did to Violate Their Rights

Under 42 U.S.C. § 1983, a plaintiff must show that he "has been deprived of a right, privilege or immunity secured by the Constitution or laws of the United States" and that the deprivation "*was committed by* a person acting under the color of state law." *See Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 658 (4th Cir. 1998) (emphasis added). The "principles of *respondeat superior* do not apply in imposing liability under § 1983" *See McWilliams v. Fairfax Cty. Bd. of Supervisors,* 72 F.3d 1191, 1197 (4th Cir. 1996). Thus, a

"plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *See Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1948 (2009). Government officials cannot be held liable for "the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Id.* The Supreme Court has held that a supervisor's mere knowledge and acquiescence in a subordinate's conduct is insufficient to state a constitutional claim; rather, "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *See Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).

Plaintiffs' strategy has been to ascribe the claimed actions of others to President Rosa without any evidence of his actions. Although Plaintiffs make bold accusations against President Rosa, they present no evidence that *he* committed any challenged actions by covering up for ReVille or assisting him to avoid detection. There is no evidence that *he* concealed anything. There is no evidence that *he* was involved in the termination of ReVille's employment. There is no evidence that *he* was involved in directing Attorney Brandenburg's investigation into Camper Doe's allegations. There is no evidence that *he* engaged in any conduct for the purpose of assisting ReVille in evading detection or abusing children.

Even viewing Plaintiffs' claims through the prism of "conspiracy," there is no evidence that President Rosa entered into an agreement or took an affirmative step for the purpose of depriving Plaintiffs of their constitutional rights. Plaintiffs rely solely on President Rosa's "office" — ignoring that they sued him in his individual capacity — to impute the claimed knowledge or actions of others to him. They proffer no evidence that *he* deprived Plaintiffs of their constitutional rights. Therefore, this Court should affirm the entry of summary judgment.

**C.    This Court Should Affirm the District Court's Grant of Summary Judgment Because Plaintiffs Do Not Proffer Evidence Creating a Genuine Issue of Material Fact of a "State Created Danger"**

### 1.    The Record and Governing Law Do Not Support Such a Claim

The District Court's grant of summary judgment was proper because there is no genuine issue of material fact that President Rosa may be held liable for a "state created danger." In their Brief, Plaintiffs argue that President Rosa took affirmative steps to create a danger to them, including:

> In sum, from April 23, 2007 onward, the following affirmative actions taken by President Rosa enabled ReVille to remain free in the Charleston community not as a known pedophile but as an esteemed Citadel alumnus and former employee: President Rosa directed the termination of ReVille from Citadel employment and warning of ReVille of the complaint; deliberately violated The Citadel's policies requiring disclosure of ReVille to law enforcement; deliberately violated Title IX; and concealed ReVille's sexual abuse from the Board of Visitors, the South Carolina unemployment agency, and within The Citadel's own files.

22

(Doc. No. 17, at p.20).    Plaintiffs further posit that President Rosa's actions described above "used his authority to create an opportunity for ReVille to sexually abuse them that would not have existed" otherwise.    (*Id.*, at p.35).    For the following reasons, the District Court correctly held that Plaintiffs' claims must fail.

Guaranteeing more than just fair process, the Due Process Clause "includes a substantive component that provides heightened protection against government interference with certain fundamental rights and liberty interests."  *See Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality).

Normally, "the Due Process Clause works only as a negative *prohibition on state action*," *Pinder v. Johnson*, 54 F.3d 1169, 1174 (4th Cir. 1995) (en banc) (emphasis added), and the state's "failure to protect an individual against private violence simply does not constitute a violation," *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989) (emphasis added); *accord Ingraham v. Wright*, 430 U.S. 651 (1977) (dealing with public school's use of corporal punishment).  Thus, it "serves 'as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security,'" *Patten v. Nichols*, 274 F.3d 829, 836 (4th Cir. 2001) (*quoting DeShaney*, 489 U.S. at 195), and "does not require governmental actors to *affirmatively* protect life, liberty, or property against intrusion by private third parties," *Pinder*, 54 F.3d at 1174 (emphasis added). "[T]he clause 'confer[s] no affirmative right to governmental aid, even where such

aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual.'" *Patten*, 274 F.3d at 836 (*quoting DeShaney*, 489 U.S. at 196)).  Because "the Due Process Clause does not require the State to provide its citizens with particular protective services, it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them." *DeShaney*, 489 U.S. at 196–97.

The Fourth Circuit has defined substantive due process as "the right to be free of *state intrusions* into realms of personal privacy and bodily security through means so brutal, demeaning and harmful as literally to shock the conscience of the court." *Hall v. Tawney*, 621 F.2d 607, 612-13 (4th Cir. 1980) (emphasis added).  "The existence of this right to ultimate bodily security, the most fundamental aspect of personal privacy, is unmistakably established in our constitutional decisions as an attribute of the ordered liberty that is the concern of substantive due process." *Id.*

A state's "failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney*, 489 U.S. at 197.  "[N]ot every state law tort becomes a federally recognized 'constitutional tort' under § 1983 simply because it is committed by a state official." *Id.*  "[T]here simply is 'no constitutional right to be protected by the state against … criminals and madmen,'"; because "there is no 'constitutional duty [on the state] to provide such protection, its failure to do so is not actionable under section 1983.'" *Fox v.*

*Custis*, 712 F.2d 84, 88 (4th Cir. 1983) (*quoting Bowers v. DeVito*, 686 F.2d 616 (7th Cir. 1982)). Due process does not guarantee "minimal levels of safety and security." *Patten*, 274 F.3d at 836 (*quoting DeShaney*, 489 U.S. at 195). Importantly, neither the United States Supreme Court, nor this Court, nor the District of South Carolina has – even to this date — recognized that allegations of intentional concealment or culpable motivation can remove a case from this rule. President Rosa posits that the facts of this case fall squarely within the prohibitions of *Pinder* and *DeShaney*. Plaintiffs proffer no evidence that President Rosa did anything to "create" a danger. He did not cause ReVille to abuse children. He did not implant pedophilic ideas in ReVille's mind. To the contrary, with or without President Rosa's alleged conduct, ReVille posed the same threat to Plaintiffs. As such, Plaintiffs cannot show that President Rosa created a danger to them. *See Reed v. Gardner*, 986 F.2d 1122 (7th Cir. 1993) ("The Reeds are no worse off with Irby driving while intoxicated than they are with Rice driving while intoxicated. Therefore, the evidence of Irby's intoxication supports a finding of summary judgment on the claim for civil rights violations.").

Plaintiffs present no evidence that President Rosa knew that ReVille was a specific threat to Plaintiffs in particular. There is no evidence that President Rosa acted to assist ReVille in abusing anyone. There is no evidence that President Rosa communicated with ReVille to advise him of Camper Doe's allegations.

There is no evidence that he provided any advice to ReVille to help him avoid detection. Instead, Plaintiffs claim – without evidentiary foundation – that President Rosa permitted ReVille to assault them by failing to report a claim of prior misconduct to law enforcement authorities or otherwise act to stop ReVille. This falls squarely within the rule set forth in *Deshaney* and its progeny. Plaintiffs' equates a state official's active participation in abuse of a known victim to the failure to stop private abuse of an unknown person; this is inconsistent with this Court's precedent in *Pinder* and other cases.

Consideration of a case where this Court *did* find a potential constitutional violation demonstrates why no violation occurred here. In *Doe ex rel. Johnson v. SCDSS,* 597 F.3d 163 (4th Cir.), *cert denied*, 131 S. Ct. 392 (2010), the Fourth Circuit Court of Appeals addressed — three years after President Rosa's alleged conduct — for the first time the question of whether a child whom DSS had *involuntarily removed* from her home and *taken into custody* could sue caseworkers who were deliberately indifferent to the risk she would be sexually assaulted by *knowingly* placing her in a foster home with a *known* sexually aggressive child. *Id.* at 172. Those facts involve far more intrusive conduct — governmental control of the custody of a child — than that alleged here; moreover, in *Johnson*, the state action was directed toward a specific victim. This Court concluded that, in the unique and extreme facts of that case, there might be a constitutional violation:

26

We now hold that when a state involuntarily removes a child from her home, thereby taking the child into its custody and care, the state has taken an affirmative act to restrain the child's liberty, triggering the protections of the Due Process Clause and imposing 'some responsibility for [the child's] safety and general well-being.' . . .

Jane was involuntarily removed from the custody of her natural parents by affirmative state action and ultimately placed in foster care approved by SCDSS. The state filed a complaint in family court alleging abuse, sought emergency and temporary custody and, ultimately, terminated the parental rights of her biological parents by judicial order. *See* S.C. Code Ann. § 20–7–1576 ("An order terminating the relationship between parent and child ... divests the parent and the child of all legal rights, powers, privileges, immunities, duties, and obligations with respect to each other, except the right of the child to inherit from the parent."). Thus, unlike the children in *DeShaney, Milburn and Weller*, Jane was clearly within the custody and control of the state social services department when foster care placement decisions were made.

*Id.* at 175-76.

Recognizing that the published law of this Circuit does not aid their claims, Plaintiff devotes substantial attention to the Fourth Circuit's unpublished 2013 opinion in *Robinson v. Lioi*, 536 Fed. Appx. 340 (4th Cir. July 30, 2013). (Doc. No. 17, at 36-38). *Lioi* is one of the only situations in which this Court has ever upheld a claim under the "state created danger" theory. There, a husband murdered his wife. Investigation disclosed that the defendant police officer had previously withheld a warrant for the husband's arrest from the domestic violence unit charged with serving it. He also sent text messages to the husband to help him evade capture. Finally, only days before the murder, the defendant refused to serve or

arrest the husband, falsely claiming that the warrant could not be found.  Under

such circumstances, the Fourth Circuit held that the defendant was not entitled to

qualified immunity, as liability for creation of danger under such circumstances

was clearly established in 2008, at the time of the conduct at issue:

> Despite Lioi's attempt to characterize his behavior otherwise, it is
> clear that his conduct, as alleged, was far more than a mere passive
> failure to act; the type of omission claim which the court rejected in
> *Pinder*.   To the contrary, Lioi is alleged to have conspired with
> Cleaven Williams "to evade capture" and "to remain free despite the
> finding of probable cause," thereby directly enabling him to harm
> Mrs. Williams.  (J.A. 20, at ¶¶ 20, 23.)  To paraphrase Pinder, Lioi's
> affirmative acts in the conspiracy with Cleaven Williams "create[d]
> the dangerous situation that resulted in a victim's injury."  . . .

> Lioi attempts to characterize his conduct in this case as a mere failure
> to act.   However, according to the complaint, that is a gross
> mischaracterization. As discussed above, Lioi's alleged conduct in this
> case was not confined to a failure to execute the arrest warrant.  Lioi
> affirmatively acted to interfere with execution of the warrant by
> conspiring with Cleaven Williams to evade capture and remain at
> large. . . .

> For qualified immunity purposes, in 2008, a reasonable police officer
> in Lioi's position would have known that a law enforcement officer
> affirmatively acting in a conspiracy with a third party to avoid arrest
> on assault charges could give rise to a constitutional violation when
> the third party acts in furtherance of the conspiracy to injure another
> person.

(J.A. 4242-49).   Controlling in *Lioi* was that the defendant *actively* assisted the

actor in killing plaintiff's decedent.  Beyond merely failing to act (or concealing

information), the defendant affirmatively *helped the crime*.

28

Unlike *Lioi*, there is *no* evidence here that President Rosa did anything to actively assist ReVille in abusing Plaintiffs. To the contrary, there is no evidence that the two even knew each other. Plaintiffs marshal no evidence that President Rosa *desired for* ReVille to abuse Plaintiffs or that he personally took (or participated in a conspiracy that took) affirmative steps to help ReVille abuse any child. Despite Plaintiffs' protestations, there is no evidence whatsoever that Plaintiffs' claims involve anything beyond a claimed passive failure to act.

It is logical there is no *constitutional violation* here; in fact, South Carolina state law does not even recognize a tort duty. Significantly, in May 2007 – around the time President Rosa learned of Camper Doe's allegations – the South Carolina Supreme Court held in *Doe v. Marion*, 373 S.C. 390, 645 S.E.2d 245 (2007), that an unknown future child sexual abuse victim could not state a claim under statutory or common law against a mandatory reporter psychiatrist who treated a perpetrator for a predilection to child molestation, *even though the defendant knew* about the abuser's proclivities and ready access to children as a pediatrician:

> Petitioner argues Dr. Graf had a duty to warn James Doe because he was a member of a readily identifiable group of future patients of Dr. Marion. In *Gilmer v. Martin*, 323 S.C. 154, 157, 473 S.E.2d 812, 814 (Ct. App. 1996), the Court of Appeals rejected a similar argument, holding "it is not simply foreseeability of the victim which gives rise to a person's liability for failure to warn; rather, it is the person's awareness of a distinct, *specific, overt threat* of harm which the individual makes *towards a particular victim*."

*See id.*, 373 S.C. at 401, 645 S.E.2d at 251 (emphasis added).

29

For these reasons, the district court properly granted President Rosa summary judgment.

## 2.    The Cases Plaintiffs Cite Are Inapposite

Plaintiffs cite a number of cases to corroborate their arguments. An examination of a number of those cases discloses that they do not help Plaintiffs' contentions. In fact, these cases only highlight how far away this case is from a legitimate Section 1983 cause of action.

At page 30, Plaintiffs cite *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443 (5th Cir. 1994); and *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720 (3d Cir. 1989), for the proposition that "[s]tate action that results in the sexual abuse of children violates the children's liberty interest in their bodily integrity." However, both of those cases involve claims that the defendant's subordinate committed acts of abuse. The cases do not apply here, as there is no evidence that ReVille was acting as President Rosa's subordinate at the time he abused Plaintiffs.

At page 32, Plaintiffs cite a number of cases for the proposition that other circuits recognize the state-created danger doctrine. However, all of those cases actually bolsters President Rosa's arguments, as those cases all required that the state actor actually *create* the danger. *See Wood v. Ostrander*, 879 F.2d 583, 589-91 (9th Cir. 1989) (state actor affirmatively abandoned female passenger alone late at night in high-crime area); *White v. Rochford*, 592 F.2d 381 (7th Cir. 1979) (state

actor created dangerous situation by abandoning children in car on cold night); *Armijo v. Wagon Mound Public Schools*, 159 F.3d 1253 (10th Cir. 1998) (state actors knowingly placed suicidal special needs student in dangerous location at home alone with access to firearms); *Kneipp v. Tedder*, 95 F.3d 1199 (3rd Cir. 1996) (state actor left intoxicated pedestrian to walk alone at night resulting in fall).

Plaintiffs discuss in detail *Sales v. Grant*, 158 F.3d 768 (4th Cir. 1998), for the proposition that Section 1983 "affords protection against a state actor who causes an individual to be subjected to the deprivation of his rights at the hands of someone other than the state actor." (Doc. No. 17, at p.33). However, *Sales* involved claims that the defendant electoral board *coerced* the new registrar to replace them for political reasons. This Court reversed the entry of a judgment as a matter of law, holding that there was enough evidence to go to a jury on the issue of whether the defendants "effectively caused the decision not to reappoint Miller and Sales." *See id.* at 777. To the contrary, there is no evidence that President Rosa coerced or otherwise directly encouraged ReVille to abuse Plaintiffs.

At pages 33-34, Plaintiffs cite a number of cases for the proposition that Section 1983 recognizes causation "by indirect means" and liability for the "natural consequences" of the defendant's actions. However, again, the cases Plaintiffs cite for these concepts all involve cases where the defendant somehow *caused* another

person to engage in an action. *See Malley v. Briggs*, 475 U.S. 335 (1986) (trooper caused unconstitutional arrest by presenting defective complaint and affidavit); *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988) (misleading statements to prosecutor caused prosecution); *Slakan v. Porter*, 737 F.2d 368 (4th Cir. 1984) (addressing liability for conduct of subordinates). Plaintiffs present no evidence that President Rosa did anything to cause ReVille to abuse anyone or that he was acting as a subordinate of President Rosa at the time of the abuse.

At pages 47-48, Plaintiffs cite several non-binding Pennsylvania district court cases for the proposition that courts have found unknown future child abuse victims "foreseeable." However, in those cases (which are not even binding on this Court), there was a readily defined group of known potential victims. *See D.N. ex rel. Nelson v. Snyder*, 608 F. Supp.2d 615 (M.D. Pa. 2009) (defendants knew officer who viewed child pornography was applying to become foster parent); *Pascocciello v. Interboro Sch. Dist.*, 2006 WL 1284964 (E.D. Pa. May 8, 2006) (future students of former teacher part of discrete class of potential victims). Here, Plaintiffs suggest that there is a "discrete" class consisting of all children with whom ReVille might come into contact in the future; this construction strains that term to essentially deprive it of any meaning.

**D.**   **President Rosa Is Entitled to Qualified Immunity**

Even if Plaintiffs could conceivably show a constitutional violation, President Rosa respectfully posits that he is entitled to qualified immunity because the alleged constitutional violation was not clearly established under governing law at the time of his alleged misconduct.

**1.**   **General Qualified Immunity Standards**

In *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), the Supreme Court stated that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.*, 457 U.S. at 818. "If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages." *Camreta v. Greene*, 131 S. Ct. 2020, 2031 (2011). Qualified immunity seeks to ensure that defendants "reasonably can anticipate when their conduct may give rise to liability," *Davis v. Scherer*, 468 U.S. 183, 195 (1984), by attaching liability only if "[t]he contours of the right [violated are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). This Court has stated:

> Qualified immunity shields a government official from liability for civil monetary damages if the officer's "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." "In determining whether the specific right allegedly violated was 'clearly established,' the proper focus is not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged." Moreover, "the manner in which this [clearly-established] right applies to the actions of the official must be apparent." As such, if there is a "legitimate question" as to whether an official's conduct constitutes a constitutional violation, the official is entitled to qualified immunity.

*Wiley v. Doory*, 14 F.3d 993 (4th Cir. 1994) (internal citations omitted).

"If the right was not clearly established in the specific context of the case – that is, if it was not clear to a reasonable [official] that the conduct in which he allegedly engaged was unlawful in the situation he confronted – then the law affords immunity from suit." *Parrish v. Cleveland*, 372 F.3d 294, 301 (4th Cir. 2004). A constitutional right "is clearly established for qualified immunity purposes when 'pre-existing law' makes the 'unlawfulness' of the act 'apparent.'" *Meeker v. Edmundson*, 415 F.3d 317, 323 (4th Cir. 2005) (*quoting Anderson*, 483 U.S. at 640).

When determining if a right is clearly established, the Court must define the right "in light of the specific context of the case, *not as a broad general proposition*." *McKinney v. Richland Cnty. Sheriff's Dep't*, 431 F.3d 415, 417 (4th Cir. 2005) (emphasis added). "To determine whether a federal right was clearly established at the time of the defendants' alleged conduct, [the court] focus[es] not

upon the right at its most general or abstract level, *but at the level of its application to the specific conduct being challenged*." *Jackson v. Long*, 102 F.3d 722, 728 (4th Cir. 1996) (emphasis added)).

In *Ashcroft v. al-Kidd*, 131 S. Ct. 2074 (2011), the Supreme Court cautioned against defining the constitutional right too broadly:

> We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate. *See ibid.; Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L.Ed.2d 271 (1986). The constitutional question in this case falls far short of that threshold. . . . We have repeatedly told courts . . . not to define clearly established law at a high level of generality. [Citations omitted.] . . . The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established.

"In determining whether a right was clearly established at the time of the claimed violation, 'courts in this circuit [ordinarily] need not look beyond the decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose.'" *Edwards v. City of Goldsboro*, 178 F.3d 231, 251 (4th Cir. 1999) (*quoting Jean v. Collins*, 155 F.3d 701, 709 (4th Cir.1998) ( en banc )). "[I]f a right is recognized in some other circuit, but not in this one, an official will ordinarily retain the immunity defense." *Id*.

## 2.     The Constitutional Right Underlying Plaintiff's Claims Was Not Clearly Established in 2007 Under the Relevant Law

### a.     The Contours of the Claimed Constitutional Right

The first question is the definition of the constitutional right.  Plaintiff has

defined the "right" broadly as the "right to bodily integrity."   However, the

Supreme Court has held that the right in question should not be defined so broadly:

> Howards contends that our cases have 'settled' the rule that, "'as a general matter[,] the First Amendment prohibits government officials from subjecting an individual to retaliatory actions'" for his speech. [Citation omitted.]  But we have previously explained that the right allegedly violated must be established, "'not as a broad general proposition,'" *Brosseau v. Haugen,* 543 U.S. 194, 198, 125 S. Ct. 596, 160 L.Ed.2d 583 (2004) *(per curiam),* but in a *"particularized"* sense so that the 'contours' of the right are clear to a reasonable official, *Anderson, supra,* at 640, 107 S. Ct. 3034.  Here, the right in question is *not the general right to be free from retaliation for one's speech, but the more specific right to be free from a retaliatory arrest that is otherwise supported by probable cause*.  This Court has never held that there is such a right.

*Reichle v. Howards,* 132 S. Ct. 2088 (2012) (emphasis added).  In other words, this

Court must define the "right" in question through the prism of the particularized

allegations at issue, not as a broad platitude.

President Rosa respectfully posits that the claimed right in question should

be defined in light of the specific facts involved here.  President Rosa believes that

the inquiry for this court should take into account the following specific facts:

- At the time of the abuse at issue, ReVille was not acting as an agent of the state or as a subordinate of President Rosa.

- Plaintiff was not abused on the campus of The Citadel.

- President Rosa did not know Plaintiff.

- President Rosa likely did not even know ReVille.

- President Rosa did not intend for ReVille to abuse the Plaintiff.

In other words, the "right" at issue is the right of an unknown potential victim to be protected from private abuse.

Plaintiffs' definition of the right in question is akin to broad definition that the Supreme Court rejected in *Reichle* ("the right to be free from retaliation for one's speech"). Defining the right as broadly as Plaintiff suggests would essentially constitutionalize all of tort law. Any negligently caused injury could be said to deprive a person of their bodily integrity. Thus, any automobile accident, slip-and-fall, or other injury-causing event involving a state actor could create liability under Section 1983. Section 1983 certainly was not intended to achieve such a result. The definition of the right must take into account the specific alleged facts and not rely on generalities and constitutional platitudes.

### b.    The Constitutional Right Was Not Clearly Established At the Relevant Time

While Plaintiff might have arguably had a right to be free from official state deprivation of bodily integrity (*i.e.,* attacks *by* state actors), he did not have, in 2007, a clearly established constitutional right to have the state act to prevent private persons from causing criminal harm.  Plaintiff cannot point to a single relevant case that would have placed President Rosa — or any other state actor — on notice that the alleged concealment, irrespective of intent or motive, of the 2007 report regarding ReVille would rise to the level of a deprivation of due process. Importantly, Plaintiffs can cite to no authority from the Supreme Court or this Circuit at the time of President Rosa's alleged conduct that specifically encompassed President Rosa's alleged violations.   The law in 2007 consisted primarily of *Pinder* and *DeShaney* and consistent cases.  None of those cases — which involved tragic scenarios where the state failed to protect those who were in its custody or promised protection — found constitutional violations.  At that time, there was plainly no case law suggesting that President Rosa could be held liable years after to unknown Plaintiffs for his failure to report ReVille.  A reasonable person in President Rosa's position could not have known that the failure to stop ReVille from abusing unknown third persons years in the future would constitute a constitutional violation.

E.     **Plaintiff Proffer No Evidence Supporting a Section 1983 Conspiracy**

1.     **Plaintiffs Cannot Possibly Satisfy the "Shocks the Conscience" Standard**

Substantive due process prohibits only the most egregious and arbitrary governmental conduct. *Patten v. Nichols*, 274 F.3d 829, 834 (4th Cir. 2001). In other words, substantive due process only prohibits government conduct that can be said to "shock[ ] the conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998); *see also Young v. City of Mount Ranier*, 238 F.3d 567, 574 (4th Cir. 2001). "While it is clear that intentionally harmful conduct may constitute a violation of the Fourteenth Amendment, it is equally clear that negligence alone does not amount to a constitutional violation." *Patten*, 274 F.3d at 834; *see Lewis*, 523 U.S. at 849 ("[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process.... [C]onduct deliberately intended to injure in   some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level"). The difficulty comes in determining "[w]hether the point of the conscience shocking is reached when injuries are produced with culpability falling within the middle range, following from something more than negligence but less than intentional conduct, such as recklessness or gross negligence." *Id.* (internal quotation marks omitted).

This Court clarified the "shocks the conscience" standard in *Slaughter v. Mayor and Council of City of Baltimore*, 682 F.3d 317 (4th Cir.), *cert. denied*, 133 S. Ct. 616 (2012). There, survivors of a firefighter recruit who died during training alleged that the defendants violated the decedent's substantive due process rights by staging the exercise without regard to his safety and willfully violating safety standards, so as to shock the conscience.

This Court affirmed dismissal of Section 1983 claims holding that — even where a defendant allegedly creates a danger — the "shocks the conscience" standard requires *actual intent to harm*:

> "The touchstone of due process is protection of the individual against arbitrary action of government." *Lewis*, 523 U.S. at 845, 118 S. Ct. 1708 (emphasis added) (internal quotation marks and alteration omitted). "Arbitrary action," however, is used in a constitutional sense, which encompasses "only the most egregious official conduct," namely that which "shocks the conscience." *Id.* at 846, 118 S. Ct. 1708. Defining conduct that shocks the conscience does not draw on any traditional standard of liability from tort law but rather refers, as a constitutional construct of substantive due process, to "conduct intended to injure in some way unjustifiable by any government interest." *Id.* at 849, 118 S. Ct. 1708. . . .
>
> It is true that in this case, as it was in *Waybright[v. Frederick County*, 528 F.3d 199 (4th Cir. 2008)]*, the Baltimore City Fire Department created the danger. But this fact does not satisfy any element of the standard that the Supreme Court has articulated for showing a substantive due process violation with respect to a government employee. Moreover, if we were to recognize that government liability could flow simply from its creation of a dangerous condition, the practical consequences would be, as we noted in *Waybright*, "immense." 528 F.3d at 208. . . .

40

> For these reasons, we hold that the Baltimore City Fire Department's constitutional liability in this case turns on whether it *intended to harm* the new recruits.

*See id.* at 321-24 (emphasis in original).

*Slaughter* clarified that "shocks the conscience" is not a tort standard of care and does not encompass conduct that is merely startling or indifferent. It does not include reckless or grossly negligent conduct. Rather, "shocks the conscience" mandates that the President Rosa have *actually intended that ReVille abuse Plaintiffs*. After voluminous discovery, Plaintiffs cite no evidence buttressing the preposterous suggestion that President Rosa intended for ReVille to abuse them. Plaintiffs can proffer no evidence whatsoever that President Rosa, for whatever reasons, actually wanted ReVille to abuse anyone, let alone them (persons completely unknown to President Rosa) specifically. Consequently, Plaintiff cannot show that President Rosa's conduct "shocks the conscience" of the court in the constitutional sense.

## 2. There is No Evidence That President Rosa Participated in a Conspiracy Intended to Deprive Plaintiffs of Constitutional Rights

In addition, Plaintiffs cannot proffer evidence sufficient to satisfy their weighty burden required to sufficiently establish conspiracy liability under § 1983. Plaintiff has not identified any evidence: (1) that there was a conspiracy involving President Rosa to violate Plaintiff's constitutional rights; (2) that President Rosa

took any action or inaction in furtherance of such a conspiracy; or (3) that President Rosa foresaw injury to Plaintiff.

To prove a conspiracy cause of action under Section 1983, Plaintiff must prove that President Rosa "acted jointly in concert [with another party] and that some overt act was done in furtherance of the conspiracy which resulted in [plaintiff's] deprivation of a constitutional right." *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996). Plaintiff bears "a weighty burden to establish a civil rights conspiracy." *Id.* While Plaintiff does not need to proffer direct evidence of a meeting of the minds, he must produce evidence "that each member of the alleged conspiracy shared *the same conspiratorial objective*." *Id.* (emphasis added); *see Hafner v. Brown*, 983 F.2d 570, 576-77 (4th Cir. 1992); *Abercrombie v. City of Catoosa Okl.*, 896 F.2d 1228, 1230-31 (10th Cir. 1990); *Fonda v. Gray*, 707 F.2d 435, 438 (9th Cir. 1983). Plaintiff must put forth facts to show that the defendants acted in concert "to try to accomplish a common and unlawful plan." *Hinkle*, 81 F.3d at 421. The conspiratorial objective must be to deprive Plaintiff of his constitutional rights. *See id.* (finding that plaintiff failed to present sufficient evidence that defendants acted in concert to obstruct access to courts in violation of Plaintiff's constitutional rights); *see also Scherer v. Balkema*, 840 F.2d 437, 442 (7th Cir. 1988) (holding prima facie case of civil conspiracy under section 1983 requires "express or implied agreement among defendants to deprive plaintiff of

42

his or her constitutional rights"); *Smith v. Bacon*, 699 F.2d 434, 437 (holding complaint alleging that state officials conspired to deprive plaintiff of right to effective assistance of counsel sufficient).

After more than a year of litigation, Plaintiff still can offer no evidence that President Rosa was part of a conspiracy to violate constitutional rights. Plaintiff has alleged conspiracies between President Rosa and other state employees to conceal ReVille's abuse of young campers in order to avoid negative publicity and potential lawsuits against The Citadel. (J.A. 40 ¶ 56; J.A. 66 ¶ 57). President Rosa has categorically denied that he engaged in any concealment regarding ReVille: "I have never directed Attorney Brandenburg, or anyone else, to conceal the allegations concerning ReVille, nor have I ever discussed concealing such allegations with anyone." (Doe 2 Docket Entry # 53-3 ¶ 5; Doe 3 Docket Entry # 33-3 ¶ 5). Attorney Brandenburg has confirmed that neither President Rosa, nor anyone else at The Citadel, ever directed him to conceal any information from anyone regarding ReVille. (Doe 2 Docket Entry # 53-2 ¶¶ 7-8; Doe 3 Docket Entry # 33-2 ¶¶ 7-8). Hours of deposition testimony and thousands of pages of produced documents have not disclosed any information that would refute President Rosa's testimony that he has never directed anyone to engage in a cover-up of the Camper Doe allegations.

Plaintiff has also generically alluded to an alleged conspiracy between President Rosa and ReVille. (J.A. 35 ¶ 25; 36-37 ¶ 34; 61 ¶ 25; and 62-63 ¶ 34). One allegation is that President Rosa "allowed [ReVille] to leave The Citadel with an unblemished record, enabling him to gain other employment in the Charleston area." (J.A. 36-37 ¶ 34; 62-63 ¶ 34).[3] This claim is false. Chris Fudge, former Director of the Writing Center at The Citadel, hired ReVille as a "tutor in The Citadel's Writing and Learning Center" in August 2006. (Doe 2 Docket Entry # 53-5 ¶ 3; Doe 3 Docket Entry # 33-5 ¶ 3). "ReVille's term of employment was scheduled to coincide with the academic year, from August, 2006, until June 30, 2007." (*Id.*). However, on March 22, 2007, ReVille requested to terminate his contract in order to seek career advancement opportunities. (Doe 2 Docket Entry # 53-5 ¶ 4; Doe 3 Docket Entry # 33-5 ¶ 4). He had told Fudge prior that time that he intended to resign his employment with The Citadel. Fudge and ReVille agreed that ReVille's employment would end April 20, 2007. (*Id.*). Fudge, as Director of the Writing and Learning Center, was responsible for preparing and submitting

---

[3] This claim is rivaled in its sensational value by Plaintiff's claim that "In 2002, upon information and belief, ReVille confessed to members of The Citadel Public Safety that he sexually abused young boys and requested the help of The Citadel." (J.A. 31 ¶ and 57 ¶ 10). This claim appears gratuitous, as President Rosa did not arrive at The Citadel until 2006. Nevertheless, the claim is false. After his arrest in 2011, ReVille told police investigators that he had approached Citadel Public Safety and asked "'How does one report inappropriate conduct with a camper,' or similar words to that effect." He has since recanted even that statement, but he has *never* said that he confessed to anyone at The Citadel that he sexually abused young boys. (Doe 2 Docket Entry # 53-4; Doe 3 Docket Entry # 33-4).

separation forms for employees in that department. (Doe 2 Docket Entry # 53-5 ¶¶ 2, 6; Doe 3 Docket Entry # 33-5 ¶¶ 2, 6). Fudge, in fact, completed a separation form for ReVille on March 22, 2007, which received that form to the Department of Human Resources that same day. (J.A. 279). It listed the separation date as April 20, 2007. (*Id.*). Upon the filing of the form in ReVille's employee file, "ReVille's employment was scheduled to end on April 20, 2007." (Doe 2 Docket Entry # 53-6 ¶ 5; Doe 3 Docket Entry # 33-6 ¶ 5). ReVille last worked at the Writing Center on April 19, 2007, several days before Camper Doe's father called The Citadel. (J.A. 280). When ReVille submitted his resignation, he did not mention, any allegations of misconduct against him, and The Citadel was unaware of any allegations. (Doe 2 Docket Entries # 53-2, 53-3 and 53-5; Doe 3 Docket Entries # 33-2, 33-3 and 33-5). ReVille's termination of employment had nothing to do with Camper Doe's allegations, and in fact, pre-dated those allegations by a month. Plaintiff can offer no evidence that President Rosa allowed ReVille to resign with a clean record to avoid reporting Camper Doe's complaint.

Both President Rosa and ReVille attest that they do not know each other and did not communicate after Camper Doe made allegations against ReVille in 2007. (Doe 2 Docket Entries # 53-2 and 53-7; Doe 3 Docket Entries # 33-2 and 33-7). ReVille attests that his only communication with President Rosa was an "informal, personal greeting in the Writing Center, Thompson Hall in the Fall of 2006." (Doe

2 Docket Entry # 53-7; Doe 3 Docket Entry # 33-7).  It is virtually impossible for there to be a conspiracy when the alleged conspirators have not communicated with each other.   Plaintiffs present no evidence that President Rosa ever communicated with ReVille about Camper Doe's allegations, ReVille's employment with The Citadel, or ReVille's potential future employment.

Although they make strident accusations, Plaintiffs proffer no evidence that President Rosa acted to further any conspiracy; that he offered Camper Doe money in exchange for his silence; or that he was even aware that Camper Doe and his parents had not reported his complaint to the police.  To the contrary, the only evidence is that President Rosa has categorically denied being part of any conspiracy to conceal ReVille's conduct.  There is certainly no evidence that President Rosa assured the Camper Doe or his parents that he would make a report to the police or did anything to prevent them from doing so.  Simply, there is no evidence that President Rosa concealed or hid ReVille's conduct, let alone that he condoned or participated in it.

### 3.     Plaintiffs' Claims Fail Under the Intra-Corporate Conspiracy Doctrine

To the extent Plaintiffs' claims allege that President Rosa conspired with other agents or employees of The Citadel, their claims also fail.  Agents of a government entity cannot be sued for conspiring with each other:

> "[I]t is basic in the law of conspiracy that you must have two persons or entities to have a conspiracy. A corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation. *Buschi v. Kirven*, 775 F.2d 1240, 1251 (4th Cir. 1985). This principle, which originated in the antitrust context, "has been applied in the civil rights area involving officials of a public body who act within the scope of their employment." *Id.* (internal citations and quotation marks omitted).

*See Walters v. City of Charleston*, 2002 WL 34703346 (D.S.C. Feb. 7, 2002) (J.A. 4414-25). (finding plaintiff could state claim under second exception where allegations Defendant maliciously and sadistically choked plaintiff); *accord Ward v. Coastal Carolina Health Care, P.A.*, 597 F. Supp. 2d 567, 573 (E.D.N.C. 2009) ("[T]o the extent that plaintiff seeks relief from defendants Davis and Nuckolls for a conspiracy arising from their alleged acts as agents of the corporate defendants, the intracorporate conspiracy doctrine bars the claim."); *Veney v. Ojeda*, 321 F. Supp. 2d 733, 748 (E.D. Va. 2004) ("[P]laintiff's claim fails under the intracorporate conspiracy doctrine because Officers Ojeda and Jones are agents of a single entity, namely the Leesburg Police Department, and thus cannot legally conspire with one another.").

Insofar as there is no evidence whatsoever that President Rosa ever knew ReVille or had any relevant interaction with him, the only possible co-conspirators with President Rosa are (or were at the relevant time) other Citadel employees. President Rosa could not conspire with such persons. Plaintiffs have not presented

any evidence that any of The Citadel's agents acted outside of the scope of their employment such that they could be co-conspirators with President Rosa; indeed, it is fundamental to Plaintiffs' claims pending in state court that the Citadel employees at all times acted *within* the course and scope of their employment.  As a result, because they claim the President Rosa conspired with another agent of The Citadel, Plaintiffs' claims fail under the intra-corporate conspiracy doctrine.

### G. The Trial Court Properly Granted President Rosa's Motion for Summary Judgment Because Most of ReVille's Alleged Abuse Occurred *Prior to* President Rosa's Alleged Conduct

Plaintiffs' claims also fail because practically all of the alleged abuse occurred *before* President Rosa had knowledge of Camper Doe's report.  In fact, ReVille began residing on Plaintiffs' property long before and had been abusing them for much of that time.  Only days after Attorney Brandenburg interviewed Camper Doe, ReVille moved out from the home of Plaintiffs and never abused them again.

The vast majority of ReVille's abuse of Plaintiffs occurred long *before* President Rosa allegedly could have known about it, let alone had any reasonable opportunity to intervene.  President Rosa's claimed violations of Section 1983 occurred after Camper Doe's report and interview.  Because practically all of the abuse predated President Rosa's alleged conduct, Plaintiffs cannot show that President Rosa "created" a danger.

ReVille began abusing Doe 2 almost *two years before Camper Doe's interview*. At the beginning, ReVille's abuse of those victims was regular. This was, to a great extent, because Plaintiffs' parent had actually invited ReVille to live at a guest house on their property starting in 2006. Plaintiffs' father was working in Georgia, so ReVille helped Plaintiffs' parents (giving rides, etc.). Unfortunately, this provided ReVille unfettered access to Plaintiffs long before President Rosa ever could have known about the Camper Doe's accusations.

After the 2006-07 school year, Plaintiffs and their family planned to move to Georgia. In the spring or early summer of 2007, ReVille moved from the family's home. Plaintiffs' family moved out of state in July or August of 2007. Thus, there was a very small window of time (1-2 months at the very most) between July 1, 2007 (Camper Doe's interview) and the end of Plaintiffs' abuse. Moreover, ReVille has testified that — after he was confronted with Camper Doe's allegations in late-April, 2007 — he greatly curtailed his abuse. ReVille stopped abusing Plaintiffs entirely in the summer of 2007, when Plaintiffs moved to Georgia. After ReVille's last abuse of them in the summer of 2007, he only saw Plaintiffs on two isolated, brief occasions. (J.A. 4738:3-15).

## 1.    **Doe 2**

ReVille routinely abused Doe 2 for nearly two years before Camper Doe's allegations in 2007. Doe 2 met ReVille in the summer of 2005, between sixth and

49

seventh grade. (J.A. 4743:16 to 4744:3). At that time, ReVille was teaching at Pinewood Prep. (J.A. 4745:23 to 4746:3). During that summer, Doe 2's parents met ReVille through their mutual involvement in AAU basketball. (J.A. 4744:25 to 4745:20). During that summer of 2005, ReVille "groomed" Doe 2. (J.A. 4747:4-17). During that time, ReVille also began showing Doe 2 pornography, and Doe 2 "learned to masturbate." (J.A. 4748:16 to 4749:3).

Toward the end of the summer of 2005, ReVille started abusing Doe 2 at ReVille's home, including masturbating him, performing oral sex on him and touching him. (J.A. 4750:4 to 4751:10). During Doe 2's seventh grade year (2005-06), ReVille continued to abuse him at ReVille's home. (J.A. 4755:23 to 4757:14).

ReVille's abuse of Doe 2 continued and escalated through 2005 and 2006, with ReVille actually moving into a bachelor suite at the home of Doe 2 and his family in the fall of 2006, when Doe 2's father was working in Atlanta. (J.A. 4751:19 to 4752:8, and 4753:21 to 4754:6). ReVille moved into the family home, partly to assist with family duties. (J.A. 4758:13 to 4759:7). There is no way that President Rosa could have known about ReVille living on Plaintiffs' property.

Plaintiffs' family so trusted ReVille that he listed their mother as a reference in a job application. (J.A. 4766-67). Before and following ReVille's move into Plaintiffs' guest house, ReVille abused Doe 2 until the family moved out of state at the end of summer of 2007. (J.A. 4761:25 to 4762:14).

50

Doe 2 testified that ReVille moved out of the family home before Doe 2's family moved to Georgia in the summer of 2007. (J.A. 4760:8-15). He further testified that ReVille continued abusing him until his family moved in the summer of 2007. (J.A. 4763:8 to 4764:5). Doe 2 testified that he did not tell his parents about ReVille's abuse of him until November, 2011. (J.A. 4765:2-15).

Doe 2's testimony is consistent with ReVille's testimony that, following Camper Doe's April, 2007 report, he "tremendously" reduced his abuse of Doe 2. (J.A. 4727:14-22).

ReVille testified he abused Doe 2 at least 12 times in 2005. (J.A. 4721:25 to 4724:18). ReVille further admitted that he abused Doe 2 "three, four times a week" in 2006. (J.A. 4725:15 to 4726:24).

ReVille testified that he moved out of Doe 2's family home by June of 2007 to Mount Pleasant. (J.A. 4727:23 to 4728:16). ReVille further testified that Plaintiffs moved with their family to Georgia in 2007, "well before school started." (J.A. 4728:17-20).

ReVille testified that, prior to April 23, 2007, he was abusing Doe 2 approximately "two to three times a week." (J.A. 4730:22 to 4731:1). He further testified that he only had two or three interactions with Doe 2 in May, 2007, six to eight interactions in June, and four to six interactions in July. (J.A. 4729:9-17, 4730:4-12). ReVille does not believe he abused Doe 2 in August of 2007.

(J.A. 4729:18-20).  ReVille does not believe he abused Doe 2 at all after July of 2007.  (J.A. 4730:13-21).

### 2.    <u>Doe 3</u>

Like his brother (Doe 2), Doe 3 was primarily abused prior to July 1, 2007. ReVille testified that he started abusing Doe 3 in 2006, after he moved onto the family's property.  (J.A. 4732:15 to 4733:14).  During the summer of 2006, ReVille abused Doe 3 on a "nearly daily" basis.  (J.A. 4734:10-12).  In the fall of 2006, ReVille abused Doe 3 3-4 times per week.  (J.A. 4735:9-12).  In early 2007, ReVille continued to abuse Doe 3 3-4 times each week.  (J.A. 4736:17-19).  ReVille greatly decreased his abuse of Doe 3 following April 23, 2007 through the summer of 2007 (when Plaintiffs moved out of state).  (J.A. 4737:1-7).  Although ReVille serially abused Doe 3 for months prior, he only abused Doe 3 "a couple" of times after Camper Doe's interview and a few times after Camper Doe's initial report.

### 3.    **Because Nearly All of the Alleged Abuse Occurred Before President Rosa Could Have Reasonably Acted, Plaintiffs' State-Created Danger Claim Must Fail**

The danger that ReVille posed predated President Rosa's possible involvement; as a result, Plaintiffs cannot show a "state-created" danger, as President Rosa did not "create" the risk.  That precise danger existed all along in Plaintiffs' home and had been actively abusing them for months, if not years, before President Rosa's alleged conduct.

A "state-created danger" claim must fail where the danger predated the defendant's actions; stated otherwise, a defendant may not be held liable for failing to prevent harm from a previously existing danger. *See e.g., Armijo v. Wagon Mound Public Schools*, 159 F.3d 1253, 1263 n. 7 (10th Cir. 1998) ("If the danger to the plaintiff existed prior to the state's intervention, then even if the state put the plaintiff back in that same danger, the state would not be liable because it could not have created a danger that already existed."); *accord Sargi v. Kent City Bd. of Educ.*, 70 F.3d 907, 913 (6th Cir. 1995) ("There is no evidence that the Board took any affirmative action that exposed decedent to any danger *to which she was not already exposed.*") (emphasis added); *Jackson v. City of Joliet*, 715 F.2d 1200, 1204-05 (7th Cir. 1983) (no liability where "state officers did not create but merely failed to avert danger" by not promptly rescuing victims from burning car); *Yeremian v. Southeastern Pa. Transp. Auth.*, 2012 WL 440635, at *6 (E.D. Pa. Feb. 7, 2012) ("[W]hile SEPTA may have been alerted of a potential danger when the Decedent did not respond to the employee's attempts to arouse him, *these actions did not create a danger because the danger already existed prior to this point.*") (J.A. 4768-77) (emphasis added); *Burton v. Benson*, 2009 WL 1351159, at *9 (E.D. Wash. May 11, 2009) ("Simply stated, the state-created danger theory can not apply where the conduct of the supervisory defendants did nothing to place Burton in any greater danger than already existed in his normal life.") (J.A. 4778-

4790); *Rogers v. City of Port Huron*, 833 F. Supp. 1212, 1218-19 (E.D. Mich. 1993) (no liability where police did not increase danger to drunken man lying next to road by refusing to assist him). Plaintiffs attempt to distinguish these cases by arguing that President Rosa's conduct was not merely passive, but "actively" contributed to a risk of harm. However, *Plaintiffs present no evidence of any President Rosa's active conduct*. Aside from unsubstantiated conspiracy theories, Plaintiffs present no evidence to sustain their claims.

*Reed v. Gardner*, 986 F.2d 1122 (7th Cir. 1993), is further instructive. In *Reed*, police officers arrested a driver and entrusted the driver's car to an intoxicated passenger. An accident ensued, and the victims of that accident sued the officer under Section 1983 who left the car to the drunk driver. While the complaint did not specifically allege that fact (and so the court could not consider it on a Rule 12 motion), apparently the defendant arrested the original driver of the vehicle for driving while intoxicated. The Seventh Circuit held that – because the district court had to accept the plaintiff's allegations and could not conclude that the original driver was intoxicated – the plaintiff could allege a state-created danger. However, the Court warned that such a claim would fail on remand because there is no state-created danger where the danger existed prior to the challenged conduct:

> [T]he Reeds face *an insurmountable hurdle* on summary judgment. As the district court foreshadowed, police officers are not subject to liability under section 1983 for exchanging one drunk driver for another. The reason is simple: without state intervention, the same danger would exist. The state action did not place individuals in a position of danger that otherwise they would not have faced. *The Reeds are no worse off with Irby driving while intoxicated than they are with Rice driving while intoxicated.* Therefore, the evidence of Irby's intoxication supports a finding of summary judgment on the claim for civil rights violations.

*See id.* 986 F.2d at 1125-26 (emphasis added).

As another court noted, a state actor cannot be held liable for creating a danger that already exists:

> Mr. Kawamoto was driving erratically before he was stopped, taken to the hospital, and evaluated by the defendants. In other words, whatever danger Mr. Kawamoto posed to the Mr. Moore (sic) after the defendants released Mr. Kawamoto from the hospital already existed prior to defendants' intervention. Indeed, the defendants seem to have done all that they believed to be was legally within their power to mitigate the risk posed by Mr. Kawamoto to himself and other drivers. While plaintiffs contend that, were it not for the defendants releasing Mr. Kawamoto and helping him replace his tire, Mr. Moore would not have been injured, this type of "but for" analysis is too remote to show that the defendants caused the accident.

*See Moore v. Utah*, 2013 WL 3148474, at *8 (D. Utah June 19, 2013) (J.A. 4791-4799).

Plaintiffs cannot show that President Rosa created the danger. ReVille was already abusing these victims (and others) long before Camper Doe's accusations and interview and long before President Rosa's alleged misconduct. ReVille's danger existed and came to fruition long before President Rosa could have acted.

There is no evidence that President Rosa *created* any risk or danger that did not already exist.  Plaintiffs cite no authority that President Rosa may be held liable under such circumstances.  Therefore, this Court should affirm the district court's entry of summary judgment.

In support of their opposition that a state actor can "create" a danger that already exists, Plaintiffs cite *Armijo v. Wagon Mound Public Schools*, 159 F.3d 1253 (10th Cir. 1998) and *Kerns v. Independent Sch. Dist. No. 31*, 984 F. Supp. 2d 1144 (N.D. Okla. 2013), arguing that this case involves "active" creation of a danger, as opposed to "passive."  (Docket No. 17, at 39-41).  However, in both of those cases, the defendants actively *created the circumstance* leading to the injury. *See Armijo*, 159 F.3d at 1263 (school actually placed mentally unstable, suicidal child alone at home with firearms); *Kerns*, 984 F. Supp. 2d at 1148-50 (defendants suspended intoxicated student but failed to call his parents or ensure he was driven home by a sober driver).  There is no evidence that President Rosa affirmatively acted to create the circumstances leading to Plaintiffs' abuse.  To the contrary, Plaintiffs claims boil down to allegations that President Rosa failed to prevent ReVille — who abused them for years — from abusing them on a relatively small number of additional occasions.  This is not a valid Section 1983 claim.

## CONCLUSION

Therefore, for all of the reasons set forth above, this Court should affirm the District Court's grant of summary judgment.

## REQUEST FOR ORAL ARGUMENT

In light of the gravity of the allegations and the nature of the legal issues implicated, President Rosa respectfully requests that this Court conduct oral argument.

Respectfully Submitted this
24th day of November, 2014

BARNWELL WHALEY PATTERSON
  & HELMS, LLC


BY: s/ M. Dawes Cooke, Jr.
M. Dawes Cooke, Jr., Esq. (Fed. ID #288)
Randell C. Stoney, Jr., Esq. (Fed. ID #4333)
John W. Fletcher, Esq. (Fed. ID #9378)
Jeremy E. Bowers, Esq. (Fed. ID #11112)
288 Meeting Street, Suite #200 (29401)
Post Office Drawer H
Charleston, South Carolina 29402-0197
Ph: (843) 577-7700
Fax: (843) 577-7708

*Attorneys for Defendant/Appellee*
  *President John W. Rosa*

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>
### Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    this brief contains <u>13,709</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    this brief has been prepared in a proportional spaced typeface using <u>Microsoft Word</u> in <u>14 point Times New Roman</u>.

    <u>\s\ M. Dawes Cooke, Jr.         </u>
    M. Dawes Cooke, Jr.

Dated: November 24, 2014

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on November 24, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Jacqueline LaPan Edgerton
William M. McLeod, Jr.
MCLEOD LAW GROUP
3 Morris Street, Suite A
Charleston, SC  29402

Julie L. Moore
DUFFY & YOUNG, LLC
96 Broad Street
Charleston, SC  29401

*Counsel for Appellants*

The necessary filing and service were performed in accordance with the instructions given to me by counsel in this case.

/s/ Melissa A. Dockery
Melissa A. Dockery
GIBSON MOORE APPELLATE SERVICES, LLC
421 East Franklin Street
Suite 230
Richmond, VA  23219